The first case call for oral argument this morning, excuse me, is Myers vs. Myers, counsel. Whenever you're ready, you may proceed. Justice's morning. My name is James Grayson. I'm the attorney for the petitioner in this case, Mr. Myers. This case comes to this court for the second time. It was an order was entered on this court previously back in 2011, which reversed the trial court judge Jensen and sent this case back to the back to the lower court for redetermination for several issues. It identified specifically four different issues, but I'm going to limit my discussions to the first issue that it was to address was to determine the proper value of the mayoral real estate. Next issue that I'm going to address is determine whether maintenance is appropriate in light of the enforcement of the mayoral property. I believe that the court's order would justify the statement that it was predisposed prior to the time this case came back to the lower court to make a determination opposing Mr. Myers. And when you look at the factors that were around this particular case, I don't think it's a stretch to say that first had to do with the with the real estate question. There was a lot of marital real estate farmland to be specific farmland and buildings, and the court made a large issue out of the qualifications of the respondents appraiser, gentleman by the name of Mr. Allman, and got into the fact that he was associated with a certified general real estate appraiser of a certified general real estate appraiser. Of course, Mr. Allman's son, who never saw the property whatsoever, but did sign off on the appraisal. That's the extent of that particular issue. But the court used that issue and went to great lengths to validate Mr. Allman's appraisal and use it in his judgment. There are lots of problems with Mr. Allman's appraisal. The largest and the easiest to identify is his failure to appraise a very substantial building associated with the property. In order to bring it into context, Mr. Myers was originally awarded property known as the Gall-Jacobs property. It's a farm that had some old buildings on it. Ms. Myers was awarded what was called the Myers farm. It had several buildings on it. It's where the parties had farmed previously and had milking operations previously. The building of the issue comes up to be this milking parlor. It turned out to be a very substantial milking parlor. Mr. Allman simply forgot it. He didn't appraise it. He admitted that he forgot it in testimony. And the way the court justified Mr. Allman not appraising that was he said under strong cross-examination, he could easily have forgotten that he appraised that piece of property. In fact, if the court looks at the cross-examination and then the redirect examination, the court will note, this court will note that Mr. Allman was not asked about that milking parlor and redirect examination by Ms. Myers' own counsel. The reason for that is he'd forgotten the property. In fact, the court adopted Ms. Zoper or Ms. Myers' argument, the closing argument, that it was simply an oversight and that there was another building. He almost quotes counsel's position paper as closing argument for the rationale behind his decision that that was just an oversight for the court's decision that that was just an oversight. That information never comes out of trial, never comes out of trial. Mr. Allman himself testified that he simply forgot the milking parlor. He admits on examination that now that he sees it, it was a very substantial building and it should have been appraised, but it was simply forgot. That alone discredits Mr. Allman's appraisal. Nothing like that happened with Mr. Myers' appraisal. Mr. Tebbe, there are several other mistakes that Mr. Allman made, but that's probably one of the greatest ones. He, in fact, admitted that he identified property on the Myers farm to reduce the value as wetland, when in reality, after he saw the photos, it wasn't wetland. He identified property as non-tellable when he admitted. It probably could have been tellable. What was the value that Tebbe put on the milking parlor? I'm not sure, Your Honor, but I believe it was... How much we're talking about? $50,000, $60,000, something like that. It was a milking parlor that had, it was a large parlor, it was brick. It had a concrete flooring and had several bays for cows. I don't remember exactly how many there were. I want to say 10, but I'm not exactly sure. Was it currently in use? At the time, at the time of the original trial, I believe it wasn't in use. At the time, it was redone. At the time we reheard this case, it was in use by Ms. Zoker. She was using it to farm the milk. But they had been in the milking business for some time, even before the divorce even started. And then it was rented to an individual who used it as a milking parlor. And it was most definitely used as a milking parlor when it came back up for rehearing before Judge Jensen once again. But when would have been the appropriate time to have evaluated that? Well, I believe, Your Honor, under the Smith case, the Fifth District Smith case, you've got to evaluate that at the time you rehear the case. Now, I don't know. So wait a second, though. And I think you mentioned that it was in operation as a milking parlor up until a particular point. And then as I remember reading in the briefs, the person who was managing it left the position. During the course of the dissolution proceedings itself. Right. Up until the time of trial, up until the time of the original trial, it had been used by this gentleman as a milking parlor for some period of time. I think there was, though, the contention that some of the equipment was that belonged to that individual. And that at the time of the hearing, it was defunct, essentially, as a milking parlor. And it was sometime afterwards when the operation restarted and there was considerable funds and equipment put back into the business. I believe in the original proceedings, Your Honor, there was an individual that was milking the – using the milking parlor. It was being rented. And he left during the course of the proceedings, immediately before trial. And – And took some of his equipment, apparently, or took – I'm only talking about the equipment which was permanently affixed to the property. The milking bays themselves, the – all of the – The structure. The accoutrement that was inside the milking parlor that makes it such. The concrete, the special concrete flooring that has to go into it. All of those things were still in place and being used right up until the time of trial. And then after trial for a period of time, and it wasn't a long period of time, after this gentleman left, it wasn't used. Ms. Zobris, Ms. Myers testified in her testimony that from November of 2008 – so she remarried in September of 2009. She rented that property, and it was used again as a milking parlor. There was no doubt that milking parlor was, in fact, an extremely substantial building. In fact, Mr. Allman testified that he saw the milking parlor, he agreed it was a substantial building, and he simply forgot it. That was their appraisal. Did he have photos of it in his appraisal? No, ma'am, he did not. He has a photo of a shed that – that he doesn't argue was the milking parlor. Opposing counsel argues that's the milking parlor. It's not the same square footage. He argues that that was the milking parlor. What Mr. Allman simply says is, I forgot it. I just absolutely forgot it. That's a major, major issue. So designating the shed is what was thought to be the milking parlor's basis. I'm trying to clarify this, of your opposing counsel saying the building was not a substantial building. Is that correct? I assume so, Your Honor. You're asking me to get into the mind of – Oh, I realize that. But I think I can take his closing argument submitted to the court as saying that it was an oversight, that really this building, which is a shed, not a milking parlor, was really what Mr. Allman meant. Mr. Allman never, ever, ever testified that's accurate. You go into his testimony, and I went through it twice. He never comes back and says, no, I made that mistake. He's never asked that question on redirect examination. On cross-examination, he admits, I missed it. I now see it. Why? Because it's in Mr. Tebbe's appraisal. And I now realize that I missed it. I do remember seeing it. So the court was confused on that issue as well because they determined that the shed was, in fact, the milking parlor. Well, I don't think the court was confused, Your Honor. I think the court chose to take the language almost verbatim from the opposing counsel's closing argument and supplant it into its order to justify the argument. So you're saying that the court knowingly switched out values on property knowing that it was, in fact, not the milking parlor? Is that what you're saying? I'm saying, Your Honor, if you look at the testimony, there was no testimony from Mr. Allman. The testimony never indicates that the milking parlor was ever appraised, was ever pictured, was ever photographed in any way, shape, or form. The only information that comes to the court on that particular issue that it addressed in its order is the almost word-for-word closing argument of opposing counsel, which says that it was an oversight by my appraisal and that really it was this shed. Okay. And so, to me, that's part of the predisposition. Well, that's beyond predisposition, actually. Okay. I'm trying to say that I believe that the judge was predisposed to try and come up with the conclusion that he wanted to reach, which was that Mr. Myers wasn't going to get anything extra by way of the court's reversal, by way of this court's reversal. And we're going to do it by justifying Mr. Allman's appraisal. Mr. Allman's appraisal on the two pieces of property is $1,000 apart. Are you saying that the judge deliberately was prejudiced against your client? I'm saying if you look at the statements that he makes during trials, Your Honor, even on the motions with respect to this case, he goes to lengths to indicate his disapproval of Mr. Myers personally. I believe, if the court goes all the way back to the very beginning, it has to do with some actions that Mr. Myers took at the very beginning of this trial that Judge Judson found not favorable. He punished him for those, but I believe that clouded his thinking with regard to the final disposition, and that's the problem that I have. There is nothing wrong with Mr. Tebbe's appraisal. Mr. Tebbe's appraisal comes back about $200,000 difference. Well, it may have affected his evaluation of your client's credibility, which may have factored into his believing later events. Which would be great if we were talking about my client's credibility on this issue. But we're talking about Mr. Allman's credibility and Mr. Tebbe's credibility. There's no question about Mr. Tebbe's credibility. He qualified as an expert. He testified as an expert. He's done hundreds, if not thousands, of these types of appraisals before, and he got every piece of property right. In fact, he went inside the old farm building to determine that it was oil fired instead of gas fired. Mr. Allman said, I didn't know that. Never knew it would affect the value of that property. He went in there to find out that there were timbers used as beams, not regular 2x4s or 2x6s. He said that would have affected the property. Mr. Allman said, I don't know the age of that farm rental. Mr. Tebbe did. He said that would affect my opinion on the value of the property. He said that he didn't do any comps on that property, which Mr. Tebbe did. That would affect the value of the property. All of those things, I believe, would leave a reasonable person to say, Mr. Allman's appraisal cannot be trusted, cannot be counted. And Mr. Tebbe's appraisal should be counted. If we take Mr. Tebbe's appraisal as it exists, there's a $200,000 difference. But I don't think you need to go any further than the parties themselves. At trial, Mr. Myers, who was originally awarded the Gull Jacobs property, and Ms. Zobrist, who was originally awarded the Myers farm, both of them were asked, would you switch? Mr. Myers said, I'd switch properties and I'd give her $100,000 as an offer. Ms. Myers said, I don't want to switch properties. I think that tells you volumes on this $1,000 difference that Mr. Allman comes up with. Those are all factors which I think should have led the court to determine that Mr. Allman's appraisal was done strictly for the purpose of trying to equalize these two properties. I don't think it takes rocket science to figure that out. If it did, I couldn't figure it out. All it takes is a plain reading to determine what happened when Mr. Allman had the idea of coming up with the exact same or very close to the exact same property values for the real estate, and therefore making no trade between the two. If the court needs further information as to whether or not the judge's predisposition against Mr. Myers is there, this court ordered Mr. Art of the Court to go back and look at the appropriation of property to determine if maintenance is proper. Originally, Judge Jensen awarded $48,000 maintenance and gross, gave my client credit for a $39,000 overpayment in a property disposition, and ordered him to pay roughly $9,000, which he did. When he went back, the judge said, irrespective of the property values, I don't think there's any difference. The problem is this. He originally placed the property value in the original court hearing of Ms. Myers' property at about $790,000. Her own appraiser valued the property at well over $1 million. It's about a 45% increase in the value of that property, which Judge Jensen said doesn't make any difference. Still going to have him pay maintenance, in spite of that fact, and in spite of the fact that he learned several other things at trial. He learned that shortly after the last hearing we had, which I believe was June of 2009, Ms. Myers and Alvin Zobris remarried in September of 2009. They operated the farm operations during the time period the first appeal was going on, and still operate that farm operations as far as we know today. He didn't take that into account. But Judge Jensen went a little bit further in affirming the award of maintenance to the petitioner. He took away the $39,000 prepayment and effectively sacked Mr. Myers with an additional $39,000. Thank you, Your Honor. Thank you, Counsel. Counsel? Please report. I'm going to take Mr. Grayson's overriding point of prejudice and ill will for the judge and both the judge and the appraisal in this case. This case started in 2007. I was in that case from the beginning. I know Mr. Grayson is now the fifth attorney in this case. We've had numerous, numerous hearings in this case. And as far as the prejudice goes, I don't think there's anything in the record to support that. In fact, as Judge Jensen noted at the first trial that we had, he gave Mr. Myers the opportunity to take either piece of land, either the Gall-Jacobs or the Myers ground, assuming he would want the Myers ground because that had been in his family longer. Mr. Myers chose the Gall-Jacobs ground because he said it was a better farm ground. He wanted to farm. So this hypothetical about switching things six, seven years down the road for my client and offering $100,000 and improving something up does not make sense. My client has made improvements to the ground and improvements to the other things. Let's get to the milking parlor. The milking parlor had not been used by Mr. and Mrs. Myers for at least six years prior to the marriage. They had sold their cows six years prior to the marriage. That is a testimony of SP-259. That had not been in use. It was only put into use after the divorce, 2009. Substantial improvements were made, and those were made by Mrs. Myers, who then had been awarded that property. To come back now in 2013, 2012, and 2013 and try to revalue that with the improvements made would be taking money away from her and putting it into his pocket. So let's talk about the milking parlor. Mr. Rahman is a certified residential appraiser. Same thing as Mr. Tefft. However, Mr. Rahman is in a partnership with his son, Kent Almond, who is a general certified residential appraiser, or general certified appraiser. That's two different statutory structures in Illinois, and it means something. A residential appraiser is supposed to appraise things from dwellings, one to four units. A general appraiser can appraise things over $500,000, as commercial farmland. Mr. Almond went through the proper process. Ms. Kent Almond reviewed Nelson Almond's appraisal, signed off on it per the state law the way that went. Now, counsel tries to say that's what the judge hung his hat on. But on page 2 of his order, he says, notwithstanding the foregoing licensure status, the testimony was determinative, and he held it more credible. Mr. Rahman relied upon the respective farmland value, farmland soil quality, soil types, slope calculations, differences between commercial farmland and non-producing fields. To me, that is the determination of value. That's the determination of credibility that's made by the judge with Mr. Rahman. Mr. Rahman looked at soil quality. Mr. Tefft says he never looked at soil quality. In fact, he said 9 out of 10 people wouldn't know what kind of soil quality it was. It's not, quote, unquote, it's not something that's really important other than to get the counselor similar. You know, 9 times 9 people out of 10 look at soil types and don't know what they're looking at. He said soil type wasn't important. Well, I'm an attorney. I'm not a farmer. But I am an attorney and bond counselor. I can tell you, when I talk to farmers and represent farmers, and I find out why this farm over here went for $10,000 an acre and why this one went for $14,000, I hear it's better dirt. You have to take productivity and soil types into account. That brings credibility to Mr. Rahman. Mr. Rahman looked at slopes and other things, but he also looked at this pasture land and this wetland. Mr. Rahman valued that much lower. He valued that at $3,000 an acre, finding this wasn't tillable. Mr. Tefft valued it at $6,500, almost the same value he quickly placed on the farmland. Well, I made the point in court, talking to Mr. Rahman and Mr. Tefft, that all land could be tillable at some point. I said we could knock down the courthouse, and if we did enough work on it, we could make it a tillable farmland. But it's not tillable now. You're not going to do that. You're not going to knock down the structure and put it in to make it tillable, to make it rise up to that value. So those values were off. The court looked at that and said that makes sense in those appraisals. As far as the milk parlor goes, I agree with counsel that it was overlooked by Mr. Ahman during the course of testimony, but it was clearly in his written appraisal. And that's what the judge looked at, and that's what the judge stated in his order, that he had to look at the totality. He didn't just look at what happened on one day in history of testimony from Mr. Rahman. And point out for me how it was clearly included in the written appraisal. In my brief, I spell out where it is in the appraisal. The judge refers to a 3,395-square-foot building. In my brief on page 17, I indicated that there's a milking parlor on page 12B providing appraised value of $10,800. And that was in the appraisal. There was a picture that corresponded with the picture that Mr. Tebbe had in his. His value, I believe, to answer your question, Your Honor, was $29,500 for the stalls and equipment. So Tebbe put $29,500 and Ahman put $10,800? That's what I got here, Your Honor, and that's what I believe were the correct numbers. But I said stalls and equipment. Here again, Ms. Zobers now has invested much money since we first came to this court in rehabbing that building, and that was testified to. It hadn't been in use for six years prior to the divorce by them. Mr. Gregg had been using it. As we saw, and you'll see in the testimony, Mr. Gregg actually left the farm due to the actions of Mr. Myers, and there was a dissipation award in there because of that, because of the lost money that they began losing because nobody was using that. So the equipment that was in there would have been what Mr. Drazen was talking about, equipment that's part of the building? I'm confused about equipment. I must tell you, I am a little bit too. From what Mr. Drazen is saying, he's saying it should be valued as the date of the appraisal. At the date of the appraisal, there would be much more equipment in there than there would have been at the date of the divorce. Ms. Myers had put more things in and got the milking parlor up and running again. And you're saying that is in the record? I believe Ms. Zobers testifies that she made improvements to that milking parlor. At the hearing on the remand? On the hearing on the remand, I believe so, Your Honor. That's my recollection. So I believe that the issue of the valuation relies upon most of the prior fact. The prior fact looked at the two appraisals. He looked at the testimony, and he looked at the actual written documents provided by the appraisals, and he made the decision that Mr. Robbins' certifications, his looking at slopes, his different valuations for different types of properties, tillable versus non-tillable, was much more credible, and that is the appraisal he went with. He addressed the milking parlor issue by saying that he saw the milking parlor, that it was an inadvertent mistake. It was indeed in the appraisal. So I think that it's clearly not an abuse of discretion on Judge Henson's part to make that determination. Now, to try to say that it was predisposed to make the properties almost equal, that flies in the face of the argument that we've already had, because, yes, they were almost equal, and that we thought they were almost equal at the beginning, and the judge in the first trial gave Mr. Myers the chance to decide between the Gall-Jacobs and the Myers farm, and he took the Gall-Jacobs at the first trial. The reason he gave him that chance was because it was a family farm. The Myers farm was part of the original family farm, so he gave him the chance. He didn't want it, though. He wanted the other one because it was a better-to-farm. And you'll see the judge, even at the motion to rehearse, says, I gave him the chance to pick the farm, and he chose a different thing. That shows you that the monies must have been equal, or nobody in their right mind would have made the wrong decision. So I don't think anybody has stepped out of bounds here to try to get something equal in value. As to the maintenance award, I believe the judge looked at the factors again after reviewing the things, after reviewing the evaluation, the appraisals, and found that the amounts differing had not changed very much in what the parties were receiving. Further, according to case law, according to Heroine, the law does not require somebody to sell property just to live up to what they're commensurate to, or impair capital. Mr. Grayson is arguing that because Ms. Zobris is receiving a vast amount of real estate, that she should somehow liquidate that to live up to the lifestyle they were used to. Neither party is doing that. Further, he seems to be chastising Ms. Zobris for using the farm and making it productive. I don't know what he really wanted her to do, lay fallow and not farm, and not get into business, and not make money. I believe Mr. Myers is also making money off of his Jacobs Golf Club. So, with that, I believe those two issues are not under mutual discretion, and this court should uphold those decisions. As to the final issue addressed in Mr. Grayson's brief regarding the insurance, actually, let me get back to the maintenance. I have a different recollection and a different knowledge of how the maintenance was awarded. The maintenance was awarded in gross at $48,000. There was a set aside for $39,000 because of the difference in property values. The only payments ever made by Mr. Myers was $8,919 towards that $48,000 maintenance agreement. And I believe that's what's reflected in the judge's final accounting on his order after his brief. So, just to clear that up. As to the insurance issue that Mr. Grayson didn't speak of, he's speaking, he said that out of the mandate of the court to include that. That was an award that was affirmed by the court the last time we were here. The judge merely put it in the resuscitation to come up with the final calculation. So, I believe that point is moved. The judge didn't take any new evidence. He just put on a recapitulation of that affirmation in the final order. So, we're not to consider that as your point? I would not consider that an issue. I think that issue was affirmed by this court, and the judge merely showed that affirmation in the final order. I'd be happy to take any questions. I don't believe there are any more. Thank you, counsel. Thank you. Counsel? Thank you, Justices. First of all, let me start by saying I appreciate the time you've given us this morning. With regard to the appraisal, I point to my Brenner case that I cited in my brief, where the court said that missing or not calculating a $50,000 debt into your appraisal is a substantial decision, a substantial deviation from what you should have done, and that brings your appraisal into question. I think this court clearly knows the exact same thing in this particular case. Take out all the other things that he missed, not reviewing the real estate, not going inside the real estate, not getting comparables. When you get to the issue of the milking parlor, which is a brick milking parlor, there's no pictures of any bricks anyplace. Mr. Wilford cites a page that it's on that's not on that page, and there is nothing in any testimony ever by Mr. Allman that says it is. He simply says, I forgot it. When we're talking about the issue of prejudice, I believe that's part of the issue. I can't tell you, I can't tell the court what was offered to Mr. Myers in the beginning and what wasn't and what discussions took place and what discussions didn't take place. I can tell you what happened at the re-hearing. At the re-hearing, he said, I'll take the Myers property and I'll give you $100,000. Ms. Zobro said, no, I'm not going to do this. So I think that speaks volumes for the way things went with regard to the issue of the property itself. With regard to the issue of the maintenance, the judge has no authority to take away the $39,000 property deviation that he already granted. He took that away. He exceeded the mandate of this court when he said, there's $48,000, I'm now taking away $39,000 that I previously gave. There was no authority to do that. He can't do it. In the same way, he justified, he put into the equation this insurance information that was already decided by the court. This court affirmed it. That issue was done and over with. He had no authority to build that into all of these numbers that he created in which he says, okay, this is the amount of dollars that now Mr. Myers owes Ms. Myers. In essence, what happened here, Justices, is Mr. Myers got punished for appealing the first time. He owes more money now by virtue of this appraisal than he did in the beginning of the first appeal. If nothing tells this court more that there's a miscarriage here, how can you owe more after you appeal than you did before? The court adds these things back onto Mr. Myers' back. There's no basis for it. There's no authority for it. He doesn't. My final point would be this. It's my opinion. I believe it's factual. The family court is supposed to be a court of equity. In this case, because of Judge Jensen's dislike for Mr. Myers long before I got involved, Mr. Myers wasn't going to get equity. This court has the opportunity to restore that equity as it did once before. We would ask that this court restore that equity again at this point in time also. Thank you very much. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case under advisement. The court will be in a short recess and continue oral arguments.